UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ALEXANDRE SELMANI,**<br><br>Plaintiff,<br><br>v.<br><br>**GLAXO SMITH KLINE,** *et al.*,<br><br>Defendants. | Civ. No. 2:16-cv-00264 (WJM)<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiff Alexandre Selmani brings this action against Glaxo Smith Kline ("GSK"), and Mitchell Kotler and Liam Kennedy, who are both individual GSK employees (collectively "Defendants"). Plaintiff alleges that Defendants violated the New Jersey Conscientious Employee Protection Act (the "CEPA") by, *inter alia*, terminating him in retaliation for his whistleblowing activity. This matter comes before the Court upon Defendant Kennedy's motion to dismiss Plaintiff's claims against him pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5). There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Kennedy's motion to dismiss is **DENIED**.

### I.    BACKGROUND

The following facts are drawn from Plaintiff's First Amended Complaint ("FAC") and are taken as true for purposes of this motion.

Plaintiff is an individual and a citizen of the State of New York. Defendant GSK is a British corporation headquartered in Brentford, London and organized under the laws of the State of New Jersey with its principal place of business in Parsippany, New Jersey. Defendant Kennedy is a citizen of the United Kingdom (the "UK") and works for Defendant GSK.

In October 2006, Plaintiff was hired by GSK. FAC ¶ 8. Plaintiff was employed as one of GSK's Managers of Biostatistics in the smoking reduction and cessation sub-category. *Id*. Mitchell Kotler, the Director of Biostatistics, was Plaintiff's direct manager. *Id*. ¶ 3. Kennedy was "GSK's Director and Head of Biostatistics, was Kotler's

1

direct superior, and was acting within the course and scope of his employment" at all relevant times. *Id.* ¶ 4.

From 2006 through 2012, Plaintiff received positive annual performance reviews, yearly raises, and year-end bonuses. *Id.* ¶¶ 11-12.

In the spring of 2012, Plaintiff "discovered that there were numerous mistakes made in the 'Smokers Health Project' being conducted by Kotler," and brought these mistakes to the attention of Kotler and Kennedy. *Id.* ¶¶ 15-16. Instead of investigating Plaintiff's concerns, Kotler and Kennedy, together with other upper-level managers, orchestrated a plan to "dissuade [Plaintiff] from raising his valid concerns, retaliate against him, and create a hostile work environment in a coordinated attempt to force [him] out of the company." *Id.* ¶¶ 17-20. "Immediately after his first whistleblowing activity, and for the first time since being employed by Defendant GSK," Plaintiff received a low rating on his 2013 annual performance review. *Id.* ¶ 14.

Plaintiff continued to report issues with other projects to Kotler and Kennedy; Defendants, in turn, continued to ignore and try to conceal Plaintiff's concerns and "formulate a plan to retaliate against him." *Id.* ¶¶ 21-27. In September 2014, Kotler met with Plaintiff in person and told him that Kennedy had given him the lowest possible rating on a performance review, which meant that he should look for another job. *Id.* ¶¶ 31-32. Throughout 2014 and 2015, Plaintiff continued to receive low performance ratings. *Id.* ¶¶ 33-35.

"On or about late July/early August 2015, [Plaintiff] met with Kennedy, in person, at GSK headquarters in Parsippany, New Jersey." *Id.* ¶ 36. At that in-person meeting, Kennedy told Plaintiff that "GSK did not need his services anymore and that [he] was going to be terminated on October 17, 2015." *Id.* ¶ 37. Plaintiff was terminated on October 17, 2015. *Id.* ¶ 38.

**Proceedings in this Court**

In his FAC, Plaintiff alleges that Defendants violated the CEPA by subjecting him to adverse employment actions, and ultimately terminating him, in retaliation for his whistleblowing activities. *Id.* ¶¶ 50-58.

A process server, who was acting on behalf of an English solicitor, personally served the FAC and Summons on Kennedy in the UK. ECF doc. 21 (Aff.). Kennedy, who is a UK citizen, now moves to dismiss the FAC for improper service of process and lack of personal jurisdiction. ECF docs. 18 (Mot.), 20 (Br.).

## II. DISCUSSION

### A. Service of Process

Federal Rule of Civil Procedure 12(b)(5) authorizes district courts to dismiss an action for insufficient service of process. Fed. R. Civ. P. 12(b)(5). The Plaintiff bears the burden of establishing that service has been effectuated under Federal Rule of Civil Procedure 4. *Grand Entm't Group v. Star Media Sales*, 988 F.2d 476, 488 (3d Cir. 1993). When an individual is served in a foreign country, the Plaintiff must show that this service was made in accordance with Federal Rule of Civil Procedure 4(f). *See* Fed. R. Civ. P. 4(f). Under this Rule, service may be effected by "any internationally agreed means that is reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1). Article 10(c) of the Hague Convention allows "any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."[1] 1969 WL 97765 (Treaty). A "restrictive interpretation [of Article 10(c)] simply does not fit within the context of the liberal service options provided in [the Hague Convention] treaty." *Koehler*, 152 F.3d at 307–08.

Here, Plaintiff has established that Kennedy was personally served in the UK by a process server who was acting on behalf of an English solicitor. *See* ECF doc. 21 (Aff.). Kennedy argues that this service was insufficient under Rule 4(f) because, in the UK, a "competent person" to serve foreign process is only an English solicitor, not via his agent or process server. Not so.

The UK has explained that it has "a *preference* for the use of direct service through English solicitors on residents of England and Wales," but it has never indicated that this is the *only* acceptable method of service. *See Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions* ¶ 58 (November 20, 2003), available at https://www.hcch.net/en/states/ authorities/details3/?aid=278 (last visited September 20, 2016) (emphasis added). In fact, the England and Wales Civil Practice Rules indicate that a solicitor's agent is considered a "competent person" to direct service of foreign process. *See* England & Wales Civil Practice Rules 6.50-52 available at http://www.justice.gov.uk  /courts/procedure-rules/civil/rules/part06#V (last visited September 15, 2016) (defining a "process server" as "a process server appointed by the Lord Chancellor to serve documents" or "the process server's agent"). In light of these Rules, several courts have found that personal service upon an individual by a process server constitutes adequate service under the UK's ratification of Article 10(b). *See, e.g., Koehler v. Dodwell,* 152 F.3d 304, 307-08 (4th Cir. 1998); *see also Pollen v. Comer*, No.

---

[1] Both the United States and the UK are signatories to the Hague Convention.

05-cv-1656, 2007 WL 1876489, at *13 (D.N.J. June 27, 2007) (holding that foreign service by the legal assistant to an English solicitor is effective).

Accordingly, the Court finds that Kennedy's restrictive interpretation of Article 10(c) has failed to rebut Plaintiff's p*rima facie* showing that service of process was valid and will **DENY** Kennedy's motion to dismiss under Rule 12(b)(5).

### B.  Personal Jurisdiction

The burden of demonstrating facts that establish personal jurisdiction falls on the Plaintiff.  *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).  A federal court sitting in New Jersey has jurisdiction over the parties to the extent provided under New Jersey state law, and New Jersey law provides for personal jurisdiction coextensive with that allowed by the United States Constitution.  *See* N.J. Court Rule 4:4–4; *DeJames v. Magnificence Carriers*, Inc., 654 F.2d 280, 284 (3d Cir. 1981).  Due process requires that a defendant have "minimum contacts" in the forum state, and that the exercise of jurisdiction comport with "traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

Minimum contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985).  "Personal jurisdiction is present if the Plaintiff's cause of action arises out of a Defendant's forum-related activities, such that the Defendant 'should reasonably anticipate being haled into court' in that forum." *FlagHouse, Inc. v. ProSource Dev., Inc.,* 528 F. App'x 186, 189 (3d Cir. 2013) (citing and quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)).

Here, Plaintiff has met his burden to establish the Court's personal jurisdiction over Kennedy.  The crux of Plaintiff's CEPA claim – that he was terminated in retaliation for his whistleblowing activities – arises out of an in-person meeting with Kennedy at GSK headquarters in Parsippany, New Jersey, during which Kennedy told Plaintiff that "GSK did not need his services anymore and that [he] was going to be terminated on October 17, 2015."  FAC ¶ 37.  At bottom, Kennedy "availed himself of the benefits and protection of New Jersey during his [meeting]; he should have reasonably anticipated that, by making representations at the headquarters of a company in New Jersey, he could be haled into court in that forum." *FlagHouse,* 528 F. App'x at 189.

Kennedy maintains that the Court lacks jurisdiction over him because the FAC "presents no allegation or evidence demonstrating that Kennedy interacted with Plaintiff in anything other than a business capacity."  Br. at 6.  Plaintiff need not present any such evidence to meet his burden.  It is axiomatic that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him," *Keeton*

4

*v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13 (1984), a principle which is sometimes referred to as the fiduciary shield doctrine, *see Cerciello v. Canale,* 563 F. App'x 924, 927–28 (3d Cir. 2014). But as long as an individual defendant has sufficient contacts with the forum state, he can be subject to personal jurisdiction in that state. *Id.* (explicitly rejecting "the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity") (citing *Calder v. Jones,* 465 U.S. 783, 789 (1984)). Here, Kennedy made sufficient contacts when he personally visited New Jersey to inform Plaintiff that he was going to be terminated; therefore, no analysis of the nature of these contacts is necessary. *Compare FlagHouse*, 528 F. App'x 186, 190 n.4 (3d Cir. 2013) ("Because . . . the Supreme Court has held that it does not violate due process to find personal jurisdiction based solely on contacts made in an employee's official capacity, there is no basis for the fiduciary shield doctrine to apply in this case and no need to undertake the participation theory analysis engaged in by the District Court.") *with Cerciello*, 563 F. App'x at 928–29 (considering the fiduciary shield doctrine where Plaintiff had produced no evidence to indicate that Defendant took any actions in an individual capacity, either in or related to the forum, sufficient to give rise to the claims).[2]

### III.   CONCLUSION

For the reasons stated above, Kennedy's motion to dismiss is **DENIED**. An appropriate order follows.

        /s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: September 22, 2016**

---

[2] Similarly, because the Court finds that it has personal jurisdiction over Kennedy arising out of his conduct which took place in New Jersey, the Court need not address the parties' arguments over whether jurisdiction arises under the *Calder* "effects test" on the basis of conduct that Kennedy directed toward the forum from outside of New Jersey. *See Calder v. Jones,* 465 U.S. 783 (1984).